[Civ. No. 16600. Fourth Dist., Div. One. May 16, 1979.]

BOARD OF MEDICAL QUALITY ASSURANCE,
Plaintiff and Respondent, v.
MEL GHERARDINI et al., Defendants and Appellants.

**Counsel**

Alexander R. Tobin and John T. Borje for Defendants and Appellants.

Evelle J. Younger, George Deukmejian, Attorneys General, and David Chandler, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**STANIFORTH, Acting P. J.**—Mount Helix General Hospital and Mel Gherardini, custodian of records, appeal an order granting a petition of the Division of Medical Quality of the Board of Medical Quality Assurance (Medical Board),[1] commanding appellants to testify and produce hospital records and documents pertaining to five named patients.[2]

## FACTS

The Medical Board would examine the complete medical-hospital records of five named patients of a San Diego doctor—a licensee of the Medical Board. The investigator's declaration in support of the subpoena duces tecum alleges: "I am conducting an investigation involving an allegation of gross negligence and/or incompetence in the treatment of patients" by the named doctor and continues: "The medical records . . . may offer evidence to substantiate the . . . allegations. . . ." The declarations allege neither patient consent nor complaint. There is no specification of any charge by a fellow physician or member of the public. No facts support the conclusionary statements. The records sought are hospital records kept by Mount Helix General Hospital (Mt. Helix). Upon Mt. Helix's refusal to surrender the records, the Medical Board sought and obtained, after hearing, the challenged superior court order.

---

[1] The Board of Medical Quality Assurance is a state agency within the Department of Consumer Affairs, State of California (Bus. & Prof. Code, § 2100). It is composed of three divisions: the Division of Medical Quality, the Division of Licensing, and the Division of Allied Health Professions (Bus. & Prof. Code, § 2100.5). The Division of Medical Quality is responsible for "(a) reviewing the quality of medical practice carried out by physician and surgeon certificate holders under the jurisdiction of the board; (b) the administration and hearing of disciplinary actions; (c) carrying out disciplinary action appropriate to findings made by a medical quality review committee, a hearing officer, or the division." (Bus. & Prof. Code, § 2100.6.)

[2] The statutes governing investigational subpoenas are set forth in Government Code sections 11180 to 11191. Section 11180 provides: "The head of each department may make investigations and prosecute actions concerning: (a) All matters relating to the business activities and subjects under the jurisdiction of the department. (b) Violations of any law or rule or order of the department. (c) Such other matters as may be provided by law." And Government Code section 11181 provides in part: "In connection with these investigations and actions he may: (a) Inspect books and records. . . . (e) Issue subpoenas for the attendance of witnesses and the production of papers, books, accounts, documents and testimony in any inquiry, investigation, hearing or proceeding pertinent or material thereto. . . ." Government Code section 11183 makes confidential all information acquired by a state officer pursuant to such subpoena.

## CONTENTIONS

Mt. Helix's refusal to surrender the records is based upon (1) the failure of the subpoena to allege facts amounting to reasonable and probable cause; (2) the patient-physician privilege (Evid. Code, §§ 990-1007); and (3) the patient's right of privacy found in the Bill of Rights of the United States Constitution and article I, section 1, of the California Constitution.

The Medical Board contends (a) "reasonable cause" need not be shown before compliance with the subpoena is required, (b) the patient-physician privilege does not apply in an investigation by the Medical Board, and (c) there is no constitutional objection to such a system.

The Medical Board concedes the patient-physician privilege, but contends Evidence Code section 1007 makes it inapplicable here; that section provides: "There is no privilege under this article in a proceeding brought by a public entity to determine whether a right, authority, license, or privilege (including the right or privilege to be employed by the public entity or to hold public office) should be revoked, suspended, terminated, limited or conditioned." The Medical Board contends this statutory exception "squarely" applies and authorizes the subpoena here. The Medical Board reasons as follows: Evidence Code section 901 defines a "proceeding" as "any action, hearing, investigation, inquest, or inquiry (whether conducted by a court, administrative agency, hearing officer, arbitrator, legislative body, or any other person authorized by law) in which, pursuant to law, testimony can be compelled to be given"; an investigation under Government Code section 11180 is a proceeding within the meaning of Evidence Code section 901, since testimony can be compelled pursuant to Government Code section 11181, subdivision (e); and concludes the doctor-patient privilege does not apply in an investigative proceeding conducted under Government Code section 11180 when the purpose of the investigation is to determine if a right, authority, license, or privilege should be revoked, suspended, terminated, limited, or conditioned. (59 Ops.Cal.Atty.Gen. 186, 194-195 (1976).)

The Medical Board further asserts that in order to compel testimony and production of documents pursuant to an administrative investigative subpoena, all that need be shown is that an investigation is under way. *Brovelli* v. *Superior Court,* 56 Cal.2d 524, 529 [15 Cal.Rptr. 630, 364 P.2d 462], cited in support of this proposition, declares: "There is no

constitutional objection to a system under which the heads of departments of government may compel the production of evidence for purposes of investigation, without instituting formal proceedings against the one from whom the evidence is sought or filing any charges against him. As has been said by the United States Supreme Court, the power to make administrative inquiry is not derived from a judicial function but is more analogous to the power of a grand jury, which does not depend on a case or controversy in order to get evidence but can investigate 'merely on suspicion that the law is being violated, or even just because it wants assurance that it is not.' [Citation.] Of course, department heads cannot compel the production of evidence in disregard of the privilege against self-incrimination or the constitutional provisions prohibiting unreasonable searches and seizures. . . . Insofar as the prohibition against unreasonable searches and seizures can be said to apply at all *it requires only that the inquiry be one which the agency demanding production is authorized to make, that the demand be not too indefinite, and that the information sought be reasonably relevant.* [Citations.]" (Italics added.) (See also *Shively* v. *Stewart,* 65 Cal.2d 475, 479 [55 Cal.Rptr. 217, 421 P.2d 65, 28 A.L.R.3d 108]; *People* v. *West Coast Shows, Inc.,* 10 Cal.App.3d 462, 470 [89 Cal.Rptr. 290]; *Fielder* v. *Berkeley Properties Co.,* 23 Cal.App.3d 30, 40 [99 Cal.Rptr. 791].)

## DISCUSSION

The right of the Medical Board to investigate, to reasonably regulate the licensee-doctor is not in dispute, but here the rights of the *patient* are under scrutiny. Therefore, we confront a threshold question of the right of Mt. Helix to assert the statutory privilege or constitutional rights to privacy on behalf of the patient who, insofar as the record reflects, has not been notified of the Medical Board's desire to look at the data or consented to such an examination by the investigators. ■ Mt. Helix, a third party recipient of privileged matter, has standing to claim the privilege on behalf of the absent nonconsenting patient (*Rudnick* v. *Superior Court,* 11 Cal.3d 924, 933, fn. 12 [114 Cal.Rptr. 603, 523 P.2d 643])[3] and under the "vicarious exclusionary rule" to object to the admission of evidence obtained in violation of another's constitutional rights (*Kaplan* v. *Superior Court,* 6 Cal.3d 150, 155-157 [98 Cal.Rptr. 649, 491 P.2d 1]).

---

[3](See note, *Protecting the Privacy of the Absent Patient: Rudnick* v. *Superior Court* (1975) 27 Hastings L.J. 99-104; see also Cooper, *The Physician's Dilemma: Protection of the Patient's Right to Privacy* (1978) 22 St. Louis U. L.J. 397.)

Since the *Brovelli* decision, the United States Supreme Court in *Katz* v. *United States,* 389 U.S. 347, 350-352 [19 L.Ed.2d 576, 581-583, 88 S.Ct. 507] added a new dimension to search and seizure law. The individual is protected under the Fourth Amendment to the federal Constitution from governmental intrusion where (1) he has exhibited a reasonable expectation of privacy, and (2) that expectation had been violated by an unreasonable government intrusion. The *Katz* concepts parallel similar reasoning with roots in the California Constitution (art. I, § 13) prohibiting unreasonable searches and seizures. While the *Katz* rule grows from a criminal setting, these parallel constitutional provisions protect the individual in as yet unmeasured, unexplored noncriminal fact settings where the individual has a reasonable expectation of privacy from state intrusion. (See *Burrows* v. *Superior Court,* 13 Cal.3d 238 [118 Cal.Rptr. 166, 529 P.2d 590]; *White* v. *Davis,* 13 Cal.3d 757, 774 [120 Cal.Rptr. 94, 533 P.2d 222]; *People* v. *Krivda,* 5 Cal.3d 357, 364-365 [96 Cal.Rptr. 62, 486 P.2d 1262]; *People* v. *Doyle,* 77 Cal.App.3d 126, 128 [141 Cal.Rptr. 639].)

The *Brovelli* decision also was written before *Griswold* v. *Connecticut,* 381 U.S. 479, 484 [14 L.Ed.2d 510, 514-515, 85 S.Ct. 1678] where the United States Supreme Court declared: "[S]pecific guarantees in the Bill of Rights have penumbras formed by emanations from those guarantees that help give them life and substance. [Citation.] Various guarantees create zones of privacy."

The breadth of the concept of privacy enunciated by *Griswold* v. *Connecticut* has been upheld in a multitude of fact contexts (*White* v. *Davis,* 13 Cal.3d 757, 774, fn. 10 [120 Cal.Rptr. 94, 533 P.2d 222]) but as yet remain a concept of as yet "undetermined parameters" albeit in process of almost daily growth. (See *Tavernetti* v. *Superior Court,* 22 Cal.3d 187, 194-195 [148 Cal.Rptr. 883, 583 P.2d 737]; *Burrows* v. *Superior Court,* 13 Cal.3d 238, 247, 248 [118 Cal.Rptr. 166, 529 P.2d 590].)

Further, the *Brovelli* rule must be examined in light of article I, section 1, of the California Constitution wherein the people of this state mandate express constitutional protection to the individual's right of privacy. Article I, section 1 (as reworded by constitutional amendment in Nov. 1974) now reads: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

█ This constitutional amendment reflects "the public policy favoring the protection of privacy rights" and "[t]his forceful expression of the constitutional stature of privacy rights reflects a concern previously evinced by the Legislature in enacting the invasion of privacy provisions of the Penal Code. The Legislature expressly declared its intent 'to protect the right of privacy of the people of this state.' (Pen. Code, § 630.)" (*Tavernetti* v. *Superior Court, supra,* 22 Cal.3d 187, 194.)

This constitutional amendment did more than declare an already existing right. "The elevation of the right to be free from invasions of privacy to constitutional stature was apparently intended to be an expansion of the privacy right. The election brochure argument states: 'The right to privacy is much more than "unnecessary wordage." It is fundamental to any free society. Privacy is not now guaranteed by our State Constitution. This simple amendment *will extend various court decisions* on privacy to insure protection of our basic rights.' (Cal.Ballot Pamp. (1972) p. 28.) (Italics added.)" (*Porten* v. *University of San Francisco,* 64 Cal.App.3d 825, 829 [134 Cal.Rptr. 839]; fn. omitted.) The Supreme Court, in *White* v. *Davis, supra,* 13 Cal.3d 757, articulated four purposes of the 1972 amendment in light of the statement contained in the election brochure (drafted by the proponents) stating: "First, the statement identifies the principal 'mischiefs' at which the amendment is directed: (1) 'government snooping' and the secret gathering of personal information; (2) the overbroad collection and retention of unnecessary personal information by government and business interests; (3) the improper use of information properly obtained for a specific purpose, for example, the use of it for another purpose or the disclosure of it to some third party; and (4) the lack of a reasonable check on the accuracy of existing records." The Supreme Court then observed: "[T]he statement makes clear that the amendment does not purport to prohibit all incursion into individual privacy but rather that any such intervention must be justified by a compelling interest. . . . the statement indicates that the amendment is intended to be self-executing, i.e., that the constitutional provision, in itself, 'creates a legal and enforceable right of privacy for every Californian.'" (*Id.,* at p. 775.) And in *People* v. *Privitera,* 23 Cal.3d 697, 709 [153 Cal.Rptr. 431, 591 P.2d 919], the Supreme Court discerned: "'[*T*]he moving force behind the new constitutional provision was a more focussed privacy concern, relating to the accelerating encroachment on personal freedom and security caused by increased surveillance and data collection activity in contemporary society.* The new provision's primary purpose is to afford individuals some

measure of protection against this most modern threat to personal privacy.' " (Italics added.)

In short the amendment was a voter response to a public awareness and concern that " ' "proliferation of government snooping and data collecting is threatening to destroy our traditional freedoms. Government agencies seem to be competing to compile the most extensive sets of dossiers of American citizens. Computerization of records makes it possible to create 'cradle-to-grave' profiles of every American." ' "(*People v. Privitera, supra,* at p. 709.)

The data here sought to be obtained would allow the administrative agency to create literally "a cradle-to-grave profile on every [Californian]" without his knowledge, without his consent. Furthermore, fundamental to the privacy of medical information "is the ability to control [its] circulation!!!!" While the statute requires the governmental agency recipient to keep the matters disclosed confidential, a discerned objective of the constitutional amendment is to keep these areas of privacy specifically away from the eyes and ears of governmental agents —to forestall "governmental snooping."

To determine whether the amendment created a right of privacy intended to protect the medical records here in dispute, we must examine into the nature of the information sought. A person's medical profile is an area of privacy infinitely more intimate, more personal in quality and nature than many areas already judicially recognized and protected. (See *Burrows* v. *Superior Court, supra,* 13 Cal.3d 238; *Valley Bank of Nevada* v. *Superior Court,* 15 Cal.3d 652 [125 Cal.Rptr. 553, 542 P.2d 977]; *White* v. *Davis, supra,* 13 Cal.3d 757; *Carlson* v. *Superior Court,* 58 Cal.App.3d 13 [129 Cal.Rptr. 650]; *Porten* v. *University of San Francisco, supra,* 64 Cal.App.3d 825; *Rudnick* v. *Superior Court,* 11 Cal.3d 924, 932-933 [114 Cal.Rptr. 603, 523 P.2d 643]; *Britt* v. *Superior Court,* 20 Cal.3d 844 [143 Cal.Rptr. 695, 574 P.2d 766]; *Tavernetti* v. *Superior Court, supra,* 22 Cal.3d 187; *In re Lifschutz,* 2 Cal.3d 415, 431-433 [85 Cal.Rptr. 829, 467 P.2d 577, 44 A.L.R.3d 1]; *Camara* v. *Municipal Court,* 387 U.S. 523 [18 L.Ed.2d 930, 87 S.Ct. 1727, 1734]; *City of Carmel-by-the-Sea* v. *Young,* 2 Cal.3d 259 [85 Cal.Rptr. 1, 466 P.2d 225, 37 A.L.R.3d 1313]; *Stanley* v. *Georgia,* 394 U.S. 557, 564 [22 L.Ed.2d 542, 549, 89 S.Ct. 1243].)

■ The patient-physician privilege (Evid. Code, §§ 990-1007) creates a zone of privacy whose purposes are (1) "to preclude humiliation of the patient that might follow disclosure of his ailments" (*City & County of*

*S.F.* v. *Superior Court,* 37 Cal.2d 227, 232 [231 P.2d 26, 25 A.L.R.3d 1418]; *Marcus* v. *Superior Court,* 18 Cal.App.3d 22, 24 [95 Cal.Rptr. 545, 74 A.L.R.3d 1051]) and (2) to encourage the patient's full disclosure to the physician of all information necessary for effective diagnosis and treatment of the patient (*In re Flint,* 100 Cal. 391, 396-397 [34 P. 863]; *Green* v. *Superior Court,* 220 Cal.App.2d 121, 125 [33 Cal.Rptr. 604]).

The patient should be able to rest assured with the knowledge that "the law recognizes the communication as confidential and guards against the possibility of his feelings being shocked or his reputation tarnished by their subsequent disclosure." (*In re Flint, supra,* at p. 397.) The matters disclosed to the physician arise in most sensitive areas often difficult to reveal even to the doctor. Their unauthorized disclosure can provoke more than just simple humiliation in a fragile personality. The reasonable expectation that such personal matters will remain with the physician are no less in a patient-physician relationship than between the patient and psychotherapist. ■ The individual's right to privacy encompasses not only the state of his mind, but also his viscera, detailed complaints of physical ills, and their emotional overtones. The state of a person's gastro-intestinal tract is as much entitled to privacy from unauthorized public or bureaucratic snooping as is that person's bank account, the contents of his library or his membership in the NAACP. We conclude the specie of privacy here sought to be invaded falls squarely within the protected ambit, the expressed objectives of article I, section 1. ■ While the amendment does not prohibit all incursions into individual privacy, "any such intervention must be justified by a compelling interest" (*White* v. *Davis, supra,* 13 Cal.3d 757, 775) and any statute authorizing invasion of such area of privacy must be subject to strict scrutiny.

## CONCLUSION

■ We start with these premises: an individual's right to privacy is not an absolute right; it may be outweighed by supervening public concerns; the State of California has a most legitimate interest in the quality of health and medical care received by its citizens; and an individual's medical records may be relevant and material in the furtherance of this legitimate state purpose; therefore, under some circumstances disclosure may permissably be compelled.

But a governmental administrative agency is not in a special or privileged category, exempt from the right of privacy requirements which

must be met and honored generally by law enforcement officials. To so hold is to ignore the federal and state constitutional commands as well as the numerous and persuasive judicial decisions in analogous areas. Moreover, such a premise focuses our attention only on the unquestioned right of the Medical Board to investigate the doctor; it ignores the patient's constitutional and statutory rights to be left alone.

■ The constitutional provisions here reviewed do not prohibit all incursions into the individual zone of privacy but rather require that any such intervention be justified by a compelling state interest. The resolution of these insistent issues involves a balancing of the respective interests and if state scrutiny is to be allowed, it must be by the least intrusive manner.

■ Such "purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." (*Shelton* v. *Tucker*, 364 U.S. 479, 488 [5 L.Ed.2d 231, 237, 81 S.Ct. 247].)

While it may be reasonably argued that prior to the 1974 amendment to article I, section 1, an administrative body was not required to make a showing of reasonable cause "before an investigatory subpoena issued," federal constitutional growth as well as the California constitutional amendment limited, circumscribed any such broad authority.

The argument that a privileged area — an area of reasonably expected privacy—can be subjected to government scrutiny just because the government wants assurance the law is not violated or a doctor is not negligent in treatment of his patient must give way before the articulated purposes of article I, section 1. Although the amendment is new and its scope as yet neither carefully defined nor analyzed by the courts, "we may safely assume that the right of privacy extends to one's confidential financial affairs *as well as to the details of one's personal life.*" (*Valley Bank of Nevada* v. *Superior Court, supra*, 15 Cal.3d 652, 656; italics added.)

To require the Medical Board, before invading the patient's medical records, to show (1) waiver or (2) "good cause" would be merely to require the administrative agency to conform to the standards to which law enforcement officials, respondents in administrative investigations, and civil litigants are held. (*Shively* v. *Stewart, supra*, 65 Cal.2d 475, 482; *Britt* v. *Superior Court, supra*, 20 Cal.3d 844, 855, 856.)

Within the *Brovelli* opinion itself we find seeds of a similar due process requirement. In fact the *Brovelli* court foreshadowed the evolving constitutional standards reviewed here in declaring: "Of course department heads cannot compel the protection of evidence in disregard of the privilege against self-incrimination or the constitutional provisions prohibiting unreasonable searches and seizures." (*Brovelli* v. *Superior Court,* 56 Cal.2d 524, 529 [15 Cal.Rptr. 630, 364 P.2d 462].) *Brovelli* further compared the administrative inquiry to the grand jury function which does not depend upon case or controversy in order to get evidence but can investigate " 'merely on suspicion that the law is being broken or even just because it wants assurances it is not.' " (*Ibid.*) We do not question the right of a grand jury to so investigate within its lawful sphere, yet it cannot invade the individual's zone of financial privacy except on a showing of due diligence in an attempt at service upon the individual (Gov. Code, § 7476, subd. (a)(1)); and upon a "written showing" of the equivalent of probable or good cause made to the superior court judge (Gov. Code, § 7476, subd. (b)(1)).

The "good cause," or "probable cause" concept involves no entombed legal formalisms. Rather "it calls for a factual exposition of a reasonable ground for the sought order." (*Waters* v. *Superior Court,* 58 Cal.2d 885, 893 [27 Cal.Rptr. 153, 377 P.2d 265].) "Good cause" which must be shown "should be such that will satisfy an impartial tribunal that the request may be granted without abuse of the inherent right of an adversary." (*Greyhound Corp.* v. *Superior Court,* 56 Cal.2d 355, 388 [15 Cal.Rptr. 90, 364 P.2d 266].) To this principle we add: without abuse of a third party's constitutionally protected right of privacy.

The declaration here sets forth no facts, no showing of relevance or materiality of the medical records of these five specified patients to the general charge of gross negligence and/or incompetence of the licensee-doctor. The state agency cannot, merely by making reference to a broad investigation enabling statute, avoid due process restraints. Beyond the showing of relevance, materiality to the investigation, it is encumbent on the Medical Board to show that the patient's constitutional rights are not infringed. If disclosure is to be compelled after the requisite balancing of the juxtaposed rights, and the finding of a compelling state interest, then it should be accomplished only by an order drawn with narrow specificity.

By interposition of such minimal due process requirements the mandate of *Katz* v. *United States, supra,* 389 U.S. 347; *Griswold* v.

*Connecticut, supra,* 381 U.S. 479, and article I, section 1, of the California Constitution will be fulfilled and Evidence Code section 1007 held constitutional. Only by such procedure may the requisite balancing of the private and the state interest be effected.

Order is reversed and remanded for proceedings not inconsistent with the views here expressed.

Wiener, J., and Ehrenfreund, J.,* concurred.

A petition for a rehearing was denied June 5, 1979, and respondent's petition for a hearing by the Supreme Court was denied August 8, 1979. Bird, C. J., and Manuel, J., did not participate therein.

---

*Assigned by the Chairperson of the Judicial Council.